## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAREDX, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | **Civil Action No. 19-662-CFC-CJB** |
| | § | |
| **vs.** | § | |
| | § | |
| **NATERA, INC.,** | § | **JURY DEMANDED** |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## FIRST AMENDED COMPLAINT

### I.        SUMMARY AND NATURE OF THE ACTION

1.        CareDx, Inc. ("**CareDx**") has invested talent, time and treasure to develop AlloSure® ("**AlloSure**"), its patented kidney transplant surveillance diagnostic test.  CareDx's innovations promise to revolutionize the treatment of kidney transplant patients by giving healthcare professionals an unprecedented ability to follow patients and detect rejection of a donated organ earlier and more accurately than the current standard of care.  Competitor Natera, Inc. ("**Natera**") has begun a false advertising campaign designed to deceive doctors, healthcare professionals, insurance companies, and patients – as well as investors – into believing that Natera's "me too" test is superior to AlloSure when that has simply not been shown.  Natera's dissemination of false and misleading claims about AlloSure is an attempt to poison the marketplace and must be stopped.

2.        CareDx is dedicated to improving the care and management of organ transplant patients by inventing, developing, manufacturing, and distributing noninvasive cell-free DNA transplant surveillance products.  Combining the latest advances in genomics and bioinformatics technology, along with its commitment to generating high quality clinical evidence through trials

and registries, CareDx markets and sells AlloSure.  AlloSure is a clinically and analytically validated, Medicare-covered, non-invasive blood test that accurately detects active kidney rejection.  It is a game-changer in the treatment of kidney transplant patients because it can ensure that healthcare professionals get the critical and reliable information necessary to treat patients – information that was previously available only (if at all) through invasive and expensive exploratory biopsies.

3.      CareDx is informed and believes that Natera has taken improper advantage of CareDx's pioneering work to develop a competing kidney transplant rejection test.  Upon information and belief, Natera is in the midst of launching its competing test, Prospera™ ("**Prospera**").  Natera is making various false and misleading claims that Prospera is superior to CareDx's AlloSure based upon a kidney transplant study (the "**Natera Study**," *see* Exhibit 1), which purports to validate the performance of Natera's kidney transplant rejection test.  Natera's claims are false.

4.      Any comparative claims regarding products such as kidney transplant surveillance tests should be supported by head-to-head clinical trials comparing the two products – ideally, randomized, well-controlled trials.  Cross-test comparisons, especially cross-test comparisons where the methodology of the underlying studies differs significantly, often lead to misleading, unreliable or false conclusions.  Here, Natera is using the results of its flawed, single-center, retrospective Natera Study to compare Prospera's performance to AlloSure's performance, which was validated by a robust, multi-center, prospective, peer-reviewed clinical trial.  Even putting aside the substantial material flaws that render the Natera Study unreliable, the methodology of the two studies differs so significantly that it is entirely improper to draw meaningful or reliable comparisons between the performances of the two products.

5.      Natera compounds the deception because the Natera Study's methodology is so deeply flawed as to be unreliable.  Natera's subsequent claims about the supposedly superior performance of Prospera are still false and misleading because they are based upon numerous unscientific, unreliable, and inappropriate conclusions and comparisons of the Natera Study performance data with CareDx's data.  Natera's deceptive claims also disparage AlloSure.

6.      Natera's false and misleading claims are contained in promotional, product marketing and investor materials and presentations that are being disseminated in connection with Prospera.  These unlawful claims are designed to persuade, among others, medical personnel who purchase, recommend, or use cell-free DNA tests in kidney transplant patients, insurance companies who cover medical treatments, kidney transplant patients who are seeking medical treatment, and investors who invest in biotech companies that offer diagnostic testing into believing that Prospera is superior to CareDx's AlloSure when it has not been shown.  Natera's false statements are harming CareDx's reputation, as well as causing lost sales and business opportunities.

7.      Natera's misrepresentations violate the federal Lanham Act, 15 U.S.C. § 1125(a), the Delaware Unfair or Deceptive Trade Practices Act, and the common law of unfair competition.  CareDx seeks to enjoin Natera's false and misleading statements concerning Prospera and AlloSure, as well as its disparaging statements concerning AlloSure.  Natera also seeks monetary and other relief for damages incurred.

## II.      PARTIES

8.      CareDx is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3260 Bayshore Blvd., Brisbane, CA 94005.

9.      CareDx was formed in 1998 by pioneers in molecular diagnostics.  Since its inception, CareDx has focused its expertise on the discovery, development and commercialization

3

of clinically differentiated, high-value solutions for organ transplant recipients.  It was the first company to develop and commercialize non-invasive transplant surveillance testing to follow transplant recipients' immune status with the aim to improve long-term patient outcomes.

10.     Today, CareDx markets and sells AlloSure.  AlloSure uses advanced DNA sequencing methods to quantify donor-derived cell-free DNA (dd-cfDNA) in transplant recipients without having to conduct separate genotyping.  Measuring dd-cfDNA in a transplant recipient's blood enables early detection of kidney transplant rejection and may facilitate personalized immunosuppressive treatment.  AlloSure has helped numerous nephrologists manage their patients' post-transplant care, while avoiding the high costs and added risks of renal biopsies.

11.     On information and belief, Natera is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 201 Industrial Road, Suite 410, San Carlos, CA 94070.  Upon information and belief, Natera is actively advertising and seeking Medicare coverage for Prospera, a kidney transplant rejection test, which it performs at its CLIA-certified laboratory in San Carlos, CA.

### III.     JURISDICTION AND VENUE

12.     This action arises under the Lanham Act, 15 U.S.C. § 1125(a) *et seq.*, and this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1338. This Court has supplemental jurisdiction over CareDx's state-law claim pursuant to 28 U.S.C. § 1367(a) because it is related to CareDx's Lanham Act claim and it forms part of the same case or controversy.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Natera is a Delaware corporation.

14.     The Court has personal jurisdiction over Natera because Natera is a Delaware corporation.

## IV.   FACTUAL ALLEGATIONS

### A.   Organ Transplant Rejection

15.     Human kidneys, two bean-shaped organs located on either side of the spine just below the rib cage, are vital organs in the human body.  The kidneys continuously filter the bloodstream, provide balance of the body's fluid and acid-base equilibrium, and eliminate from the body certain waste or toxins in the urine. Various diseases can cause kidneys to lose their filtering ability, which results in the accumulation of harmful levels of fluid and toxins in the body, and may progress to kidney failure, also known as end-stage renal disease or end-stage kidney disease.  To stay alive, individuals with end-stage kidney disease must either have fluid and toxins removed from their bloodstream through hemodialysis (which involves significant patient inconvenience and relatively high cost), or have a kidney transplant (which has superior long-term outcomes and cost effectiveness, but are not always available).

16.     Kidney transplant recipients have an increased risk for complications such as infections and cancers, and generally require long-term immune system suppression medications to prevent organ rejection.  Early detection of rejection is critical—the earlier the patient and his/her medical professional team learns of the transplant rejection, the sooner preventive measures and treatment can occur.

17.     The generally-accepted method for diagnosis of active rejection ("**AR**") of a transplanted kidney is assessment, by light microscopy examination, of kidney tissue obtained from a needle biopsy.  However, biopsies are invasive, can be painful, can cause complications in patients and are expensive; accordingly, they are generally not used for regular surveillance for rejection in transplant patients.

18.     Prior to the development of AlloSure, there were no existing non-invasive biomarkers that had established adequately-validated performance to detect active rejection of a

kidney transplant. The current standard of care is a screening blood test to measure creatinine (an indicator of kidney function) in a transplant recipient's blood.  A high serum creatinine level may indicate that the kidney is in rejection, but unfortunately, creatinine is not specific for kidney rejection.  Moreover, an increased creatinine may not be observed until after irreversible damage to the kidney has already occurred.

> **B.      Cell-free DNA**

19.      Practical use of cell-free DNA (cfDNA) technology for care of kidney transplant recipients has been led by CareDx. Cell-free DNA are fragments of DNA found in the bloodstream of the transplant recipient. When a transplant recipient's immune system is rejecting a donor kidney, cell-free DNA originating from the donor kidney (donor-derived cell-free DNA or dd cfDNA) is released from the organ cells undergoing cell injury and death into the patient's bloodstream.  High levels of the donor-derived cell-free DNA in a recipient's blood may indicate the transplanted organ is being rejected.

20.      CareDx markets and sells AlloSure, which measures the proportion (percentage) of donor-derived cell-free DNA found in a transplant patient's bloodstream. The AlloSure test value indicates the health or injury of the transplanted organ.  This testing method provides a new and different dimension and versatility for surveillance of the well-being of the patient and the transplanted organ than serum creatinine testing or kidney biopsies.

> **C.      CareDx's Clinical Studies to Validate the Results of Cell-free DNA Testing**

21.      At substantial time and expense, CareDx conducted a multi-center, prospective observational clinical trial to validate the clinical performance of AlloSure.  This clinical trial is named the Circulating Donor-Derived Cell-Free DNA in Blood for Diagnosing Acute Rejection in Kidney Transplant Recipients ("DART") study.  It involved collecting blood specimens at scheduled intervals and at the time of clinically-indicated biopsies from 14 clinical sites

6

representative of the United States renal transplant registry population and comparing the levels of donor-derived cell-free DNA with the biopsy results. The report of study results was peer-reviewed and published in the July 2017 issue of the *Journal of the American Society of Nephrology*, authored by RD Bloom (the "**CareDx Study**," *see* Exhibit 2).

22.     Cell-free DNA nephrology (kidney) diagnostic test performance can be measured by metrics including **Specificity, Sensitivity,** and **AUC** (area under the curve).

23.     **Sensitivity** is the measure of the percentage of true positive test results—i.e., it quantifies the percentage of test results that correctly identify kidney rejection. Also referred to as the "rule-out" scenario, if a positive test result is highly sensitive (meaning it is good at identifying nearly all true positives), and a patient receives a negative test result, the healthcare provider is fairly certain that the patient does *not* have the disease under consideration.

24.     **Specificity** is the measure of the percentage of true negative results—i.e., it quantifies the percentage of test results that correctly identify where a transplant patient is not in active rejection. Also referred to as the "rule-in" scenario, if a test result is highly specific (meaning it is good at identifying true negatives), and a patient receives positive test results, the healthcare provider is fairly certain that the patient *does* have the disease under consideration.

25.     Whereas the sensitivity and specificity values are dependent upon the chosen cut-off value of the test (*e.g.*, 1% dd-cfDNA), the **AUC**, on the other hand, is a performance metric that uses the sensitivity and specificity at all possible test cut-off values to calculate a measure for the overall accuracy of the test. The **AUC** is determined by drawing a graph for the range of potential test result cut-off values, with the test's true positive rate (sensitivity) plotted on the y-axis and the false positive rate (specificity, plotted as 1-specificity) on the x-axis, and measuring the area under this curve. The chart plots all possible values for the test's sensitivity and

7

specificity.  If a test has only a random ability to identify true positives and negatives (and thus is not predictive or useful to make a diagnosis), the AUC will be 0.5—a straight diagonal, in which the true positive rate proportionally increases with the false positive rate at different cut-off points.  As a test nears perfect diagnostic performance, the AUC will approach 1.0.

26.     The DART study showed that CareDx's AlloSure markedly outperformed serum creatinine testing in sensitivity, specificity, and AUC for detecting active rejection, and that AlloSure, unlike serum creatinine, is highly accurate in being able to distinguish rejection from no rejection.

### D.     The Natera Study is Too Flawed and Unreliable to Support Claims About Prospera's Performance, Let Alone Comparative Claims

27.     Wanting to capitalize on CareDx's innovative success, Natera developed its own cell-free DNA test—Prospera—and sponsored a clinical study purportedly to validate its effectiveness.  Natera then falsely represented, in numerous investor, press, and advertising materials that the results of the Natera Study show that Prospera is superior to CareDx's AlloSure. But unlike the DART study, the Natera Study is so flawed as to both its methodology and its execution that not only are its results unreliable, they cannot be used to support any fair comparisons between the performance of Prospera and the performance of AlloSure of the kind that Natera has attempted.

28.     Unlike the CareDx study, which utilized an observational protocol that involved gathering and analyzing samples from 14 clinical centers at pre-defined timepoints, the investigators for the Natera Study chose instead to retrospectively select samples that had been collected for unrelated purposes by a single clinical center and archived.  The results of the retrospective study purporting to validate the test that would come to be known as Prospera were published in the December 23, 2018 issue of the *Journal of Clinical Medicine*, authored by Tara

K. Sigdel (the **"Natera Study Publication"**).   Unlike the rigorous and prestigious Journal of American Society of Nephrology that published the CareDx AlloSure Study, the *Journal of Clinical Medicine* has yet to establish a level of quality of content and is *not* a kidney or transplant specific publication, and therefore has limited experience and depth of peer review for reviewing kidney transplant rejection tests.

> ### a.   The Sample Set From the Natera Study is Not Representative of the Transplant Population

29.    To begin with, the samples analyzed in the Natera Study are not representative of the real-world kidney transplant population, as they were taken retrospectively from a pre-existing sample archive collected from a single study center with biopsies purportedly re-interpreted by a single pathologist.   Accordingly, the Natera Study had to rely on existing samples and had no control over when these samples were collected or analyzed.   Consequently, the results obtained from Natera's narrow sample set cannot be used to extrapolate results that are representative of the results that can be expected of the test in the broad range and diversity of the kidney transplant population and sample handling procedures encountered in the real world.   In contrast, the CareDx Study was prospectively planned and collected samples from a representative patient population across the United States.   The CareDx Study was a multi-center study, which means that samples analyzed in the CareDx Study were collected from fourteen (14) study centers with biopsies primarily interpreted by the real-world pathologists at each center.   Whereas the biopsies in the CareDx Study reflect real-world pathologists' readings of tissue specimens, the Natera Study represents only a *single* center's pathologist readings.   In other words, to the extent that any systemic biases were inherent in the way that samples were collected, labeled, read, stored, handled or shipped from a single location, these biases would have been reflected in the final results of the study as they were not balanced by methods from other centers. Accordingly, the data obtained

WEIL:\97359584\3\33715.0003

from Natera's pre-existing sample set cannot reliably be used to extrapolate results for the entire kidney transplant population.

30.     Further, 20% of the patients from whom samples were analyzed in the Natera Study were under the age of 18, and *all* of the under-18 patients are classified as "**NR**" (no rejection). Such uniform results are surprising and suspicious because children are *more likely* to suffer active rejection of an organ transplant ("**AR**"), yet there is no indication that any attempt was made either to understand these anomalous results or to exclude the samples.  Furthermore, the inclusion of samples from children under 18 generally demonstrates a lack of concern for the potential biasing effect, given the different likelihood of rejection between children and adults.  In contrast, the CareDx Study methodology included only samples from adult patients.

**b.     Claims Based on the Natera Study Include Excluded Samples**

31.     The investigators in the Natera Study "collected" from the sample bank archive 300 samples from 193 unique renal transplant recipients.  In its initial representations about the Natera Study – for example, in an 8K filed with the FTC and a June 2018 investor call – Natera made claims about Prospera's performance based on its analysis of 292 samples from 187 patients.  *See* Exhibit 3.  Yet, in the Natera Study Publication, the results are based an analysis of only 217 samples.  Of the 300 collected samples, 60 samples were eliminated because they were not biopsy matched (meaning no biopsy corresponded with the plasma sample); 15 samples were excluded because they were collected within three (3) days from transplant and an additional 8 samples were excluded as they were unable to be sequenced (a sample set that excludes only these last 8 samples is the basis for Natera's oft-cited, misleading "292-set" sample size).    Nevertheless, Natera continued to represent that its study was based on 292 samples.  This misleading statement unfairly magnified the significance of the study.

WEIL:\97359584\3\33715.0003

### c.     The Natera Study Improperly Mixes Population Sets

32.     "For cause" kidney biopsies are conducted on patients for whom a warning sign about possible AR has been triggered (for example, a high serum creatinine level).  A "protocol" (or "surveillance") biopsy is conducted even though the patient has no prior indication of AR. "Protocol" biopsies are not a standard practice at most U.S. centers; instead, most centers do not perform "protocol" biopsies due to the low frequency of finding rejection compared to the risks and costs of the procedure.  The Natera Study further biases its sample selection by mixing "for cause" and "protocol" biopsy samples in a manner that inappropriately skews the performance metrics of the Natera Study in Prospera's favor.

33.     Because "for cause" biopsies are prompted by a warning sign for AR, one would expect that a higher proportion of "for cause" biopsies would show AR than "protocol" biopsies, which are not prompted by a warning sign. Similarly, one would expect that a higher proportion of "protocol" biopsies would show NR than "for cause" biopsies.  However, rather than analyze the "for cause" and "protocol" biopsies separately, as would be appropriate, Natera chose to pool the biopsy data.  Because Natera analyzed by NR and AR groups, this pooling meant that "protocol" biopsies were (predictably) underrepresented in the AR group and (predictably) overrepresented in the NR group, improving the apparent performance of the Natera Study. Including "protocol" biopsies because they are not likely to show rejection tends to artificially inflate Prospera's ability to identify true negatives (i.e., specificity).  The "protocol" biopsy samples are more likely to be "easy" calls in that there is no AR, inflating the appearance of Prospera's accuracy.  In contrast, CareDx *only* analyzed "for cause" biopsies, the population most vulnerable to AR.

### d.    The Natera Study Does Not Adhere to the Banff Rules

34.    The Banff Classification of Allograft Pathology (the "**Banff Rules**") is an international consensus classification for the reporting of biopsies from solid organ transplants. The Banff Rules provide criteria for the diagnosis of types of kidney rejections. The Banff Rules are reviewed and updated every two (2) years in light of the rapidly expanding information about kidney transplants.  Only kidney transplant rejection studies conducted in accordance with the Banff Rules are accepted in the transplant research and scientific community.

35.    Although the Natera Study Publication claims to adhere to the 2017 Banff Rules ("All pathology samples were read at UCSF by a single renal pathologist and rated according to the recently updated Banff criteria"), the detailed criteria found in the Natera Study Publication do not consistently comport with the 2017 Banff Rules, especially in classifications of T cell-mediated rejection ("**TCMR**") and antibody-mediated rejection ("**ABMR**"), forms of AR.  For instance, the Natera Study methods define TCMR by excluding the most common type of TCMR (grade IA). Further, the Natera Study introduced new ABMR terms not found or recognized in the Banff classification system.  Natera likely excluded such samples in order to obtain more favorable, but scientifically invalid, test performance results.  In contrast, the CareDx Study strictly adhered to all Banff 2013 criteria (the relevant standard at the time) in its analysis, including TCMR IA, without sample selection or rule interpretation bias.

36.    By misclassifying the types of AR, Natera is either excluding certain patients/samples by leaving out certain patients/samples entirely, or improperly classifying them as NR by placing them in the NR group, distorting the performance metrics of Natera's product, and preventing any lawful comparison to AlloSure.

**E.     The Natera Study Cannot Support Any Comparative Claims Between Prospera and AlloSure**

37.     Natera bases its false and misleading claims for Prospera on a purported comparison between the results of the Natera Study and the results of the CareDx Study, but any comparison is entirely invalid.   Any comparative claims regarding products such as kidney transplant surveillance tests must be supported by head-to-head clinical trials comparing the two products.   Cross-test comparisons, especially cross-test comparisons where the methodology of the underlying studies differ significantly, are not reliable and often lead to misleading or false conclusions.   Here, Natera is using the results of its flawed, single-center, retrospective Natera Study to compare Prospera's performance to AlloSure's performance based on the results of a robust, multi-center, prospective peer-reviewed clinical trial that validated the performance of AlloSure.   Even putting aside the substantial material flaws that render the Natera Study unreliable, the methodology of the two studies differs so significantly that no meaningful or reliable comparisons can be drawn between the performance of the two products.   The Natera Study is not "equal" to the clinically and analytically validated CareDx Study, nor are they head-to-head studies.   Accordingly, all claims that these tests demonstrate anything about Prospera's performance compared to AlloSure's performance are literally false and entirely misleading.

38.     Natera's manipulation of its test results, combined with its pattern of blatant falsehoods concerning the accuracy and veracity of Prospera as compared to AlloSure, reflects Natera's intent to unlawfully deceive and mislead consumers.   CareDx respectfully seeks an immediate halt to Natera's continued false and misleading advertising claims, along with monetary damages and other requested relief.

WEIL:\97359584\3\33715.0003

**F.**     **Natera Makes False and Misleading Representations About the Natera Study's Results**

39.     Natera has, and, unless prevented, will continue to make false, misleading, and harmful representations about the Natera Study's results, including, but not limited to, the following examples.

40.     **June 2018 Press Release:**  Natera's June 21, 2018 press release refers to data pulled from the Natera Study and makes false claims such as, "This performance data suggests the potential of Natera's assay for use in both rule-in and rule-out applications" and "This sensitivity compares favorably against competition [citation to the CareDx Study], which reported only 59% sensitivity in a 2017 study."  *See* Exhibit 4.  The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that its comparison claims are precluded.  Moreover, Natera does not report its value for specificity— required for "rule-in" applications—which is actually significantly lower than its sensitivity value and the non-comparable value from the CareDx Study.  In addition, in the press release, Natera asserts that the performance data for Prospera was derived from "300 plasma samples from 193 unique kidney transplant patients."  Such a statement is false because the conclusions of the Natera Study were made from a study of 217 samples from 178 unique patients.

41.     **8K:**  Natera's June 27, 2018 8K included a slide entitled "Natera Assay Outperforms Competition," comparing the performance metrics from Prospera to AlloSure.  *See* Exhibit 3.  The data used in the 8K slide is from the Natera Study, and from a data set of 292 samples, which wrongfully includes both 15 samples excluded from the Natera Study Publication for failure to meet inclusion criteria, *and* an additional 60 samples eliminated from the Natera Study in the Natera Study Publication because they were not biopsy matched (meaning no biopsy

14

corresponded with the plasma sample). Moreover, although the methodology differs and the studies cannot support comparative claims, it is clear from the data that Natera presents that even with all the advantages of the biases in the Natera Study, the specificity for Prospera as measured in the Natera Study and presented on the slide (73%) is lower than the non-comparable specificity value for AlloSure in the CareDx Study presented on the slide (85%).   The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

42.   **July 2018 Prospectus Supplement:**   Natera's July 12, 2018 Prospectus Supplement claims that Natera evaluated "292 plasma samples from 187 unique kidney transplant patients" and that "Natera's dd-cfDNA assay demonstrated 92% sensitivity in detecting acute rejection….[t]his sensitivity compares favorably against competition, which reported only 59% sensitivity in a 2017 study."   *See* Exhibit 5.   These statements are false.   The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

43.   **January 2019 Press Release:**   Natera's January 7, 2019 press release purports to compare the performances of Prospera with AlloSure and falsely states that Prospera "include[s] higher sensitivity and nearly 18% area under the curve (AUC) than the competitive assay [AlloSure]," and "the [Natera] study results also showed higher sensitivity (89% vs. 59%) and higher AUC (0.87 vs. 0.74) than the competitive assay [AlloSure]."   *See* Exhibit 6.   These statements are false.   The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's

15

methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

44.      **January 2019 JP Morgan Presentation:** The January 9, 2019 Natera Company Presentation at the J.P. Morgan Healthcare Conference contains literally false statements about Prospera, including "driven by superior clinical data." The presentation also wrongfully compares Prospera with AlloSure, with statements such as, "Highest area under the curve; First test to consistently detect subclinical acute rejection." *See* Exhibit 7. These statements are false. The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

45.      **Steve Chapman's Misleading Public Statements:** At the J.P. Morgan Healthcare Conference, Steve Chapman, President and CEO of Natera, gave an oral presentation in which he wrongfully claimed that Prospera is superior to AlloSure, "So second, the performance [uh] was eighteen percent better than the competitor's clinical valuation as measured by area under the curve, which is a metric that combines sensitivity and specificity. Third, [uh] we were the first company to perform well in T-cell mediated rejection, which is about one third of rejection cases, where we have one hundred percent sensitivity compared to our competitor's twenty seven percent sensitivity." These statements are false. The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

46.      **February 1, 2019 Press Release:** Natera's February 1, 2019 press release falsely states that its Assay is superior to AlloSure, including through statements such as, "Natera's assay

detected acute rejection (AR) with 89% sensitivity and 0.87 area under the curve (AUC) . . . compar[ing] favorably against competition, which in a 2017 study [the CareDx Study] reported 59% sensitivity and 0.74 AUC . . . No other dd-cfDNA assay has been shown to detect TCMR or validated to detect subclinical AR . . ." *See* Exhibit 8.  These statements are false.  The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

47.    **February 22, 2019 Press Release:**  Natera's February 22, 2019 press release also falsely states that its Assay is superior to AlloSure, including through statements such as, "The excellent analytical performance of Natera's dd-cfDNA assay underpins its superior clinical performance in detecting active allograft rejection (AR)," and "In its recently published clinical validation study, Natera reported higher sensitivity (89% vs. 59%) and higher area under the curve (0.87 vs. 0.74) than the competing dd-cfDNA assay." *See* Exhibit 9.  These statements are false. The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

48.    **False Advertisement at CEOT Conference:**  In a false advertisement included within the conference bag of each attendee at the February 21-23, 2019 American Society of Transplantation CEOT Conference, Natera, citing both the Natera and CareDx Studies, falsely wrote: "Natera's assay detected acute rejection (AR) with 89% sensitivity and 0.87 area under the curve (AUC).  This test performance . . . compares favorably against competition, which in a 2017 study reported 59% sensitivity and 0.74 AUC." *See* Exhibit 10.  These statements are false.  The comparisons to AlloSure are false both because the Natera Study is so materially and substantially

17

flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

49.     **March 2019 Press Release:**  Natera's March 28, 2019 press release falsely states that its Assay is superior to Allosure, including through statements such as, "Natera reported higher sensitivity (89% vs. 59%) and higher area under the curve (0.87 vs. 0.74) than the competing dd-cfDNA assay." *See* Exhibit 11.  These statements are false.  The comparisons to AlloSure are false both because the Natera Study is so materially and substantially flawed that it is unreliable, and because the Natera Study's methodology differs so significantly from the CareDx Study's methodology that comparison claims are precluded.

50.     Natera's campaign of deception and false advertising is ongoing; the foregoing examples merely represent some of Natera's false and misleading communications.

### G.     Natera's False and Misleading Statements Have Harmed and Will Continue to Harm CareDx

51.     Natera and CareDx are competitors.  Both companies have introduced genomic-based testing services and products.  Natera's false and misleading statements about AlloSure have harmed and will continue to harm CareDx though loss of goodwill, reputation, profits, and prospective business contracts.

52.     Upon information and belief, Natera has begun significant marketing efforts for Prospera, including by making Prospera available for use in clinical trials and marketing Prospera to major clinical centers for such use.

53.     Upon information and belief, Natera's false and misleading statements have harmed CareDx's reputation and have caused it to lose sales.

## CAUSES OF ACTION

### COUNT ONE – LANHAM ACT VIOLATION
### False Advertising in Violation of 15 U.S.C. § 1125(a)

54.     CareDx incorporates by reference all the allegations set forth above as if fully set forth herein.

55.     Natera and its representatives and agents made false and misleading statements, including but not limited to direct communications and written promotional materials to healthcare professionals, insurance companies, patients, and the general public about the nature, characteristics, and quality of AlloSure.   These false and misleading statements include representations that the Natera Study showed that Prospera is superior to AlloSure, including because (i) Prospera detects AR with greater sensitivity; (ii) Prospera detects AR with higher AUC; (iii) the Natera Study is reliable; and (iv) the results of the Natera Study can be used to support claims comparing the performances of Prospera and AlloSure. These statements are literally false and/or misleading commercial speech in violation of the Lanham Act, 15 U.S.C. § 1125(a).

56.     Natera's false and misleading statements were made in interstate commerce, and in the context of commercial advertising or promotion, as they were made for the purpose of influencing healthcare providers, insurance companies, patients, and the general public to use Prospera, or recommend or cover Natera instead of AlloSure or CareDx, as well as to harm CareDx's reputation and business prospects in the marketplace.

57.     Natera made its false and misleading statements knowingly and willfully, or recklessly to healthcare providers, insurance companies, patients, and the general public.

58.     Natera's false and misleading statements likely have (and, unless stopped, will continue to) deceive healthcare providers, insurance companies, patients, and the general public about the capabilities and accuracy of AlloSure.

59.     Natera's false and misleading statements are material and will affect the purchasing and investment decisions of healthcare providers, patients, and insurance companies.

60.     Natera's false and misleading statements have and are likely to cause substantial harm to CareDx in the marketplace, including lost business and loss of goodwill and reputation. Natera's conduct constitutes false and misleading descriptions or representations about its own and a competitor's goods and services under the Lanham Act, 15 U.S.C. § 1125(a). CareDx is entitled to all relief available for such false and misleading statements, including but not limited to injunctive relief, disgorgement of Natera's ill-gotten profits, recovery of CareDx's damages, attorneys' fees, the costs of this action, and treble damages. *See id.* § 1117(a).

## COUNT TWO
## COMMON LAW UNFAIR COMPETITION

61.     CareDx incorporates by reference all the allegations set forth above as if fully set forth herein.

62.     Natera and its representatives and agents willfully made false and misleading statements, including but not limited to direct communications and written promotional materials to healthcare professionals, insurance companies, patients, and the general public about the nature, characteristics, and quality of AlloSure. These false and misleading statements include representations that the Natera Study showed that Prospera is superior to AlloSure, including because (i) Prospera detects AR with greater sensitivity; (ii) Prospera detects AR with higher AUC; (iii) the Natera Study is reliable; and (iv) the results of the Natera Study can be used to support claims comparing the performances of Prospera and AlloSure.

63.     Natera's false and misleading statements were made in interstate commerce, and in the context of commercial advertising or promotion, as they were made for the purpose of influencing patients and healthcare providers to use Natera's products instead of AlloSure when

testing for kidney transplant rejection, as well as to harm CareDx's reputation and business prospects in the marketplace.

64.    Natera made its false and misleading statements knowingly or recklessly to healthcare providers, insurance companies, patients, and the general public.

65.    Natera's false and misleading statements likely have (and, unless stopped, will continue to) deceive healthcare providers, patients, insurance companies, and the general public about the capabilities and accuracy of AlloSure.

66.    Natera's false and misleading statements have and are likely to cause substantial harm to CareDx in the marketplace, including lost business and loss of goodwill and reputation. CareDx is entitled to damages from Natera, as well as other remedies provided under the law.

## COUNT THREE
## DELAWARE UNFAIR OR DECEPTIVE TRADE PRACTICES
### 6 Del. C. §§2532(a)(5), (8), (12)

67.    CareDx incorporates by reference all the allegations set forth above as if fully set forth herein.

68.    Natera's false and misleading advertising, investor, and promotional materials falsely compare the Natera Study with the CareDx Study, even though the two Studies are incapable of head-to-head comparison because their methodologies greatly differ, and because the Natera Study's data sets are too unreliable to allow for such comparison.  Natera's false and misleading statements relating to Prospera and AlloSure have violated subsections 5, 8, and 12 of the Delaware Unfair and Deceptive Trade Practices Act (the "**UDTPA**").

69.    In violation of Section 5 of the UDTPA Natera's false and misleading statements represent that Prospera has uses or benefits that it does not have.  For example, Natera falsely claims that Prospera: (i) has a superior clinical performance in detecting AR; (ii) is the first test to

consistently detect subclinical acute rejection; and (iii) is more sensitive than competing assays. These advertising and promotional materials claims are based on the severely flawed Natera Study and misrepresent Prospera's efficacy.

70.     In violation of Section 8 of the UDTPA Natera's false and misleading statements disparage AlloSure and CareDx by representing that AlloSure is of a lower standard, quality, or grade than it actually is.  Natera is making statements touting Prospera's superiority to AlloSure, including: (i) Prospera's "sensitivity compares favorably against competition;" (ii) Prospera's "performance [uh] was eighteen percent better than the competitor's clinical valuation;" and (iii) "[n]o other dd-cfDNA assay has been shown to detect TCMR or validated to detect subclinical AR."  These statements falsely represent that AlloSure is inferior to Prospera, when that has not been shown by any study, including the Natera Study.

71.     Natera's false and misleading statements cause likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with Prospera and AlloSure in violation of section 12 of the UDTPA. These false and misleading statements include representations that the Natera Study showed that Prospera is superior to AlloSure, including because: (i) Prospera detects AR with greater sensitivity; (ii) Prospera detects AR with higher AUC; (iii) the Natera Study is reliable; and (iv) the results of the Natera Study can be used to support claims comparing the performances of Prospera and AlloSure.

72.     Natera made its false and misleading statements knowingly or recklessly.

73.     These false and misleading statements violate the Delaware Deceptive Trade Practices Act, 6 Del. C. §§2532(a)(5), (8), (12).

## JURY DEMAND

74.     CareDx requests a trial by jury.

## **PRAYER**

**WHEREFORE**, CareDx respectfully requests that the Court enter an order awarding the following relief:

a.   Judgment in favor of CareDx and against Natera;

b.   An Order preliminarily and permanently enjoining Natera from disseminating or causing the dissemination of the false and misleading statements as alleged herein;

c.   An Order requiring Natera to take all necessary corrective measures to correct the false and misleading impressions created among healthcare professionals by the false and misleading statements alleged herein;

d.   CareDx's actual monetary damages, including but not limited to CareDx's lost business and profits, harm to CareDx's goodwill and reputation, and Natera's ill-gotten and unjustly derived revenues

e.   Punitive and exemplary damages;

f.   Pre- and post-judgment interest on all monetary damages, as permitted by law;

g.   Costs of this litigation, including expert witness fees, as permitted by law;

h.   Attorneys' fees, as permitted by law;

i.   Statutory damages, including multipliers and equitable enhancements, as permitted by law; and

j.   Such other and further relief, at law or in equity, to which CareDx is justly entitled.

WEIL:\97359584\3\33715.0003

Dated: February 7, 2020

Of Counsel:

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

WEIL:\97359584\3\33715.0003